305 F.3d 67
 TCG NEW YORK, INC., TC Systems, Inc. and Teleport Communications d/b/a TCNY, Plaintiffs-Appellants-Cross-Appellees,
v.
CITY OF WHITE PLAINS, Defendant-Appellee-Cross-Appellant.
 Docket No. 01-7213(L).
 Docket No. 01-7255(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: December 3, 2001.
 Decided: September 12, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Peter D. Keisler, Sidley Austin Brown & Wood (Stephen B. Kinnaird, Sidley Austin Brown & Wood, Robert G. Scott, Jr., and T. Scott Thompson, Cole, Raywid & Braverman, Mark C. Rosenblum, Stephen C. Garavito, and Teresa Marrero, AT & T Corp., Basking Ridge, NJ, on the brief), Washington, DC, for Plaintiffs-Appellants-Cross-Appellees.
 Philip W. Horton, Arnold & Porter, (Anthony Boccanfuso, Arnold & Porter, New York, NY, Robert M. Cooper, Arnold & Porter, on the brief) Washington, DC, for Defendant-Appellee-Cross-Appellant.
 John E. Ingle, Deputy Associate General Counsel (Rodger D. Citron, Counsel, Federal Communications Commission, Charles A. James, Assistant Attorney General, John M. Nannes, Acting Assistant Attorney General, Catherine G. O'Sullivan, and Nancy C. Garrison, Attorneys, United States Department of Justice, Antitrust Division, on the brief) Washington, DC, for Amici Curiae Federal Communications Commission and the United States.
 Michael R. Hepworth, Piper, Marbury, Rudnick & Wolfe LLP (David A. Handzo and Janis C. Kestenbaum, Jenner & Block, LLC, Washington, DC, Thomas F. O'Neil III, Chief Legal Counsel, and V. Nicole Bynum, WorldCom, Inc., Washington, DC, on the brief) New York, N.Y. for Amicus Curiae WorldCom, Inc. in support of TCG.
 Michael D. Hess, Corporation Counsel of the City of New York(Stephen J. McGrath and Bruce Regal, on the brief) New York, NY, for Amicus Curiae City of New York in support of City of White Plains.
 Andrew Brick, Counsel, Albany, NY, for Amicus Curiae New York State Conference of Mayors and Municipal Officials in support of City of White Plains.
 William Malone, Miller & Van Eaton (Nicholas Miller and Matthew C. Ames, Miller & Van Eaton, Henry W. Underhill, General Counsel and Executive Director, and Lani L. Williams, Associate Counsel, International Municipal Lawyers Association, Danielle DeMers, Office of the Town Attorney, Town of Colonie, Newtonville, NY, on the brief) Washington, DC, for Amici Curiae Local Governments in support of City of White Plains.
 Before: WALKER, Chief Judge, NEWMAN and F.I. PARKER, Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Plaintiffs TCG New York, Inc., TC Systems, Inc., and Teleport Communications d/b/a TCNY (collectively, "TCG") brought an action against the City of White Plains (the "City" or "White Plains") alleging that White Plains's franchising ordinance and proposed franchise agreements violated § 253 of the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 253 ("§ 253"), the Fourteenth Amendment, and state law. The District Court for the Southern District of New York (Barrington D. Parker, Jr., then-District Judge) decided the case on stipulated facts and held in part for TCG and in part for the City. Both sides appealed. We affirm in part and reverse in part.
 
 BACKGROUND
 
 2
 TCG, a provider of telephone and telecommunications services, is a group of wholly-owned subsidiaries of Teleport Communications Group, itself a wholly-owned subsidiary of AT & T Corporation. For purposes of this appeal, TCG can be treated as a unitary entity. In order to provide telecommunications services within White Plains, TCG sought the City's approval to construct telecommunications facilities and place other equipment within the City's public rights-of-way. In particular, TCG sought permission to build new conduits and to run a network of fiber optic cables through both these new conduits and preexisting ones in the City. Although TCG negotiated with the City starting in early 1992, the relevant negotiations are those that took place after December 1, 1997, when the Common Council of the City passed an ordinance providing a process by which telecommunications carriers could gain approval to place equipment in the City's rights-of-way. See White Plains Municipal Code, Telecommunications Franchising and Licensing, Articles 1-3 (the "Ordinance").
 
 
 3
 TCG filed an application for a revocable license in April 1998. Under the City's scheme, revocable licenses govern limited uses of rights-of-way for internal operations of a business, whereas franchises govern uses of rights-of-way on a broader scale to sell or resell telecommunications services to residents of the City. See Ordinance, §§ 1-1-07, 1-1-12, 2-1-02, 2-1-06, and 2-1-07. In June 1998, the City's Corporation Counsel suggested that TCG apply for a franchise, rather than a revocable license, and provided TCG with a copy of a franchise agreement it had reached with one of TCG's competitors. After some negotiations over the terms of a franchise agreement, TCG submitted an application for a franchise in February 1999 and effectively discontinued pursuing a revocable license. In June 1999, TCG filed this lawsuit, alleging that White Plains's Ordinance and the proposed franchise agreement violated its rights under the TCA, the Fourteenth Amendment, and state law. In August 1999, White Plains made a new franchise agreement proposal (the "August Proposal"). This case concerns the validity of both the Ordinance and certain provisions in the August Proposal as amended.
 
 
 4
 Section 253 of the TCA provides, in relevant part:
 
 
 5
 (a) In general. No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.
 
 
 6
 (b) State regulatory authority. Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with [47 U.S.C. § 254], requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.
 
 
 7
 (c) State and local government authority. Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.
 
 
 8
 (d) Preemption. If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.
 
 
 9
 47 U.S.C. § 253.
 
 
 10
 The Ordinance forbids any telecommunications provider from using the rights-of-way of the City without obtaining a franchise or revocable license from the Common Council and that incorporates the requirements of the Ordinance. See Ordinance, §§ 2-1-01, 2-1-03. Applications for franchises are required to contain numerous disclosures. Some of these disclosures, which relate to basic management of the rights-of-way, are not disputed. See Ordinance, § 2-3-02(i), (iii), (iv), (v), and (viii).
 
 
 11
 Disclosures required by the Ordinance that are challenged in this action include a description of the telecommunications services that the franchisee seeks to provide; the proposed financing plans for constructing and operating the applicant's telecommunications system; and a description of the "legal, financial, technical and other appropriate qualifications of the applicant." Id. at (ii), (vi), and (vii). In addition to these disclosures, the Ordinance requires that franchise agreements contain terms that specify what telecommunication services are to be offered, require the franchisee to maintain accurate records, and grant the City a right to inspect records and facilities. See Ordinance, § 2.9.01(ii), (viii), and (vi).
 
 
 12
 The Ordinance also contains a variety of substantive requirements. Franchises may not be transferred without the prior consent of the City. See id. at (xii). Franchise agreements must contain any additional provisions the City deems "necessary or appropriate in furtherance of the public interest." Id. at (xvii). Similarly, before approving a franchise, the Common Council may consider the qualifications of an applicant, whether the franchise agreement "protect[s] the public interest," and "any other public interest factors." Ordinance, § 2-7-01(ii), (vi), and (vii).
 
 
 13
 TCG's attack is not confined to the Ordinance, but also challenges a number of the terms contained in the August Proposal. Of central importance to this appeal is a fee provision that requires TCG to pay five percent of its annual gross revenues from White Plains business to the City. See August Proposal, § 8.1(a). The fee provision also sets a minimum annual fee and requires TCG to provide White Plains with free conduit space for its own use if TCG constructs new conduits. Id. at §§ 8.1(b), 8.2. White Plains also included in its August Proposal a "most favored vendee" clause, whereby TCG is required to offer services to the City on terms that are at least as good as the terms TCG offers to any other governmental or non-profit customer in Westchester County. Id. at § 2.7. To ensure that franchise fees would be paid, White Plains also included provisions requiring a secondary guaranty from AT & T, TCG's corporate parent, to pay any fees that TCG defaults on and requiring TCG to maintain financial records at a fixed location available for the City's inspection. Id. at §§ 16, 12.1, 12.2 and 8.5.
 
 
 14
 Beyond the foregoing financial provisions, the August Proposal precludes TCG from transferring the franchise or ownership of more than twenty percent of TCG without prior consent from White Plains, implementing § 2-9-01(xii) of the Ordinance. See August Proposal, § 14. The August Proposal also requires TCG to seek prior City approval for installations of any part of the network within its boundaries, including installations that are exclusively on private property. Id. at §§ 11.9(d) and 12.3. Finally, the City insisted on provisions that waive TCG's right to challenge provisions of the August Proposal or the Ordinance in court. Id. at §§ 3.1(4) and 13.6.
 
 
 15
 Although the City has entered into franchise agreements pursuant to the Ordinance with some telecommunications providers, it has not required any formal franchise agreement from the incumbent provider, Verizon, formerly known as Bell Atlantic, NYNEX, and New York Telephone. Moreover, Verizon is not required to pay any franchise fee. While Verizon and its predecessors have provided the City with free conduit space since 1919, the value of the free conduit space has never been estimated.
 
 
 16
 TCG argued before the district court that the Ordinance and the August Proposal violated § 253 because 1) they "prohibit or have the effect of prohibiting" TCG's ability to provide telecommunications services; 2) they amount to prohibited regulation that go beyond management of the public rights-of-way; and 3) they require TCG to pay compensation that is neither "fair and reasonable" nor sought "on a competitively neutral and nondiscriminatory basis." Additional claims advanced by TCG under the Constitution and state law were rejected by the district court and are not appealed.
 
 
 17
 Applying § 253 of the TCA, the district court found that the Ordinance had the effect of prohibiting TCG from providing telecommunications services. However, it concluded that portions of the Ordinance and August Proposal were saved by § 253(c), the statute's savings clause, including the licensing fee. The district court also concluded that substantial portions of the Ordinance and the August Proposal were invalid because they were not confined to managing the public rights-of-way, but rather impermissibly regulated telecommunications. Both sides appealed.
 
 DISCUSSION
 I. Jurisdiction
 
 18
 The first matter that needs to be considered is whether this court has jurisdiction to resolve TCG's claims. One circuit court has held, in the context of TCA litigation, that if no private cause of action is created by a statute, the federal courts lack subject matter jurisdiction. See TCG Detroit v. City of Dearborn, 206 F.3d 618, 622-24 (6th Cir.2000) (holding that, because the existence of a cause of action goes to subject matter jurisdiction, courts must determine whether an implied cause of action is created sua sponte, and then concluding that § 253 does imply a private cause of action). White Plains does not argue that there is no private cause of action, but if the issue were jurisdictional, we would have to determine it nonetheless. The Sixth Circuit's reliance on Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), is misguided. Merrell Dow addressed the issue of whether federal question jurisdiction exists when a plaintiff brings a state cause of action that depends on a federal statute that does not create a private cause of action. Id. at 808-19. It did not reach the question of whether the existence of a federal cause of action is jurisdictional. However, the Supreme Court has since squarely decided the issue, holding that "[t]he question whether a federal statute creates a claim for relief is not jurisdictional." Northwest Airlines, Inc. v. County of Kent, 510 U.S. 355, 365, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994). Accordingly, since White Plains does not argue that there is no private cause of action, we need not reach the issue.
 
 
 19
 We must also consider whether the action should be dismissed under the doctrine of primary jurisdiction. Primary jurisdiction is a judge-made doctrine intended to promote proper relationships between the courts and administrative agencies. Johnson v. Nyack Hosp., 964 F.2d 116, 122 (2d Cir.1992). The doctrine serves two principal interests: "consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and the resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims." Golden Hill Paugussett Tribe v. Weicker, 39 F.3d 51, 59 (2d Cir.1994). We have also cited judicial economy as an interest that the primary jurisdiction doctrine can serve. Johnson, 964 F.2d at 123.
 
 
 20
 As a preliminary matter, we note that the Federal Communications Commission ("FCC") filed an amicus brief in this case and, at our request, provided supplemental briefing on both the issue of where jurisdiction to decide this case lies and on the substantive issues to be determined. The FCC did not definitively state an opinion on whether it has concurrent jurisdiction with the district courts over § 253, but it did outline several reasons to think that jurisdiction should be concurrent. For example, the FCC noted that § 253 does not use language, included elsewhere in the TCA, that confers exclusive jurisdiction in the Commission. See, e.g., 47 U.S.C. § 255(f). The absence of such language does not foreclose primary jurisdiction, however, because primary jurisdiction goes to the issue of when, not whether, courts should consider issues. But it does counsel against a conclusion that the FCC should decide these issues first.
 
 
 21
 Amicus briefs from an agency can serve much of the interest in consistency and uniformity of law that underlies the doctrine of primary jurisdiction, while avoiding some of the delay that sometimes results from dismissing on the ground of primary jurisdiction. See 2 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 14.6, 304 (3d ed.1994). On the substantive issues, the FCC expressed opinions as to some issues but declined to make definitive statements on others, such as the questions of whether a gross revenue fee could be "fair and reasonable compensation," compensation should be limited to a local government's costs, or some other formula is appropriate. While the FCC's response was not exhaustive, it was informative on some issues.
 
 
 22
 In considering primary jurisdiction, we think it is significant that the parties in this case stipulated to the facts. Although we acknowledge that an agency's role in "marshaling [the facts] into a meaningful pattern", Fed. Mar. Bd. v. Isbrandtsen Co., 356 U.S. 481, 498, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), does cover some cases where the underlying facts are not in dispute, we also believe that where the facts are undisputed, it will rarely be appropriate to dismiss on the basis of primary jurisdiction. In addition, disputes over whether a local ordinance violates § 253 will often be factually straightforward. The difficult questions in this area are normally the legal questions, which means that the important concern for determining issues of primary jurisdiction is consistency and uniformity in ... regulation." Considering the "relatively narrow scope of the doctrine of primary jurisdiction," Goya Foods, Inc. v. Tropicana Prods., 846 F.2d 848, 851 (2d Cir.1988), the fact that all of the issues here are questions of law, and having received the FCC's views on some of the issues, we decline to dismiss on the basis of primary jurisdiction.
 
 II. Standard of Review
 
 23
 Because, as we have noted, the parties stipulated to all facts, the district court's conclusions are exclusively conclusions of law that are reviewed de novo. See, e.g., Gen. Elec. Co. v. Comm'r, 245 F.3d 149, 154 (2d Cir.2001). The parties disagree over whether the court should defer to the judgments of the FCC under Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). TCG, supported by the federal government's amicus brief, argues that deference is required because the FCC has authority to administer the entirety of Chapter 5 of Title 47 (the Wire or Radio Communications chapter), except as specific provisions of the chapter provide. See 47 U.S.C. § 151 ("there is created a commission to be known as the `Federal Communications Commission', which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter."); 47 U.S.C. § 201(b) ("The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.").
 
 
 24
 White Plains primarily argues that deference is inappropriate because § 253(d), by omitting reference to § 253(c), removed disputes involving § 253(c) from the FCC's jurisdiction. § 253(d) provides that:
 
 
 25
 [i]f, after notice and an opportunity for public comment, the [FCC] determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the [FCC] shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.
 
 
 26
 47 U.S.C. § 253(d).
 
 
 27
 White Plains argues that the legislative history of subsection (d) establishes that it was intended to deprive the FCC of jurisdiction over issues involving the interpretation of subsection (c). A prior version of subsection (d) that required the FCC to preempt any local provisions that violated § 253 was defeated and replaced by the current provision. Several circumstances, however, make it difficult to accept White Plains's argument. First, White Plains argues elsewhere that subsection (e) is a savings clause that creates no independent restrictions but rather permits certain restrictions that would otherwise have been prohibited by subsection (a). Although this argument is not necessarily inconsistent with White Plains's jurisdictional argument, the plain language of the text which allows the FCC to preempt provisions inconsistent with subsection (a) strongly implies that the FCC has the ability to interpret subsection (e) to determine whether provisions are protected from preemption. Second, the provisions of § 253(d) are mandatory: the FCC "shall preempt" local statutes to remedy violations of § 253(a) or (b). In light of the FCC's general regulatory authority, the inclusion of a mandatory regulatory role does not logically foreclose FCC action in the areas where it is not mandatory. Third, because § 253(c) provides a defense to alleged violations of § 253(a) or (b), if § 253(d) were read to preclude FCC consideration of disputes involving the interpretation of § 253(c), it would create a procedural oddity where the appropriate forum would be determined by the defendant's answer, not the complaint. It is true that the well-pleaded complaint rule is a matter of statutory construction, not a constitutional requirement for jurisdiction. Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908). Thus, Congress could choose to apply a different rule under some circumstances, and indeed courts have recognized some exceptions. See, e.g., Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63-64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (describing ERISA preemption as so complete that a complaint raising only state-law claims is necessarily federal in nature because of the preemption defense and so may be removed). However, we will not assume that Congress made such a choice here without stronger evidence.
 
 
 28
 Although the language of § 253(d) supports the conclusion that cases such as this one should not be dismissed under the doctrine of primary jurisdiction, it does not support the conclusion that no deference is owed to the FCC. Consequently, the FCC's decisions interpreting the scope of § 253(c) merit some deference. See Olmstead v. Zimring, 527 U.S. 581, 598, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (agency views entitled to be consulted for helpful guidance even if not Chevron deference); Reno v. Koray, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (agency guideline, not subject to rigors of Administrative Procedure Act, entitled to "some deference").
 
 
 29
 White Plains also argues that under Chevron, the statute is sufficiently clear that there is no basis for deference and that the relevant FCC decisions do not control this case. See Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. Although we do not reach the issue of whether the statute is sufficiently clear to eliminate the need for deference, we agree that the relevant FCC decisions are not controlling.
 
 
 30
 III. Whether White Plains is Prohibiting or Effectively Prohibiting Telecommunications Services
 
 
 31
 Section 253(a) specifies that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). Courts have held that a prohibition does not need to be complete or "insurmountable" to run afoul of § 253(a). See, e.g., RT Communications, Inc. v. FCC, 201 F.3d 1264, 1268 (10th Cir.2000). Additionally, the FCC has stated that, in determining whether an ordinance has the effect of prohibiting the provision of telecommunications services, it "consider[s] whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." Cal. Payphone Ass'n, 12 F.C.C.R. 14191, 1997 WL 400726, at ¶ 31 (1997). We agree with these precedents.
 
 
 32
 Certain portions of White Plains's Ordinance clearly have the effect of prohibiting TCG from providing telecommunications service. In particular, the provision that gives the Common Council the right to reject any application based on any "public interest factors ... that are deemed pertinent by the City" amounts to a right to prohibit providing telecommunications services, albeit one that can be waived by the City. See Ordinance, § 2.7-01(vii). Similarly, the extensive delays in processing TCG's request for a franchise have prohibited TCG from providing service for the duration of the delays. In light of the obstacles that the Ordinance poses to TCG's ability to compete in White Plains on a fair basis, we conclude that the Ordinance violates § 253(a).
 
 
 33
 While we conclude that the Ordinance as a whole violates § 253(a), we must nevertheless analyze whether portions of the Ordinance and of the August Proposal are saved by § 253(c). This analysis is required because applying § 253(c) to the Ordinance as a whole without considering individual provisions could result in an improper infringement of the City's legitimate interests in regulating the uses of the public rights-of-way. Conversely, applying § 253(a) to individual provisions without considering the Ordinance as a whole would neglect the possibility that a town could effectively prohibit telecommunications services through a combination of individually non-objectionable provisions. We note that the district court applied this methodology and neither party objected.
 
 IV. The August Proposal's Gross Revenue Fee
 
 34
 The most significant provision of the August Proposal is the requirement that TCG pay five percent of its annual gross revenues from White Plains business to the City. See August Proposal, § 8-1(a). Section 253(c) provides:
 
 
 35
 Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.
 
 
 36
 47 U.S.C. § 253(c). In order for the fee to fall within this savings clause, the fee must constitute "fair and reasonable compensation" and must be applied "on a nondiscriminatory basis." We consider these issues separately with respect to the five-percent gross revenue fee White Plains is charging TCG.
 
 
 37
 A. "Fair and reasonable compensation"
 
 
 38
 The statute does not define the scope of "fair and reasonable compensation." The core issue is whether to be "fair and reasonable" such "compensation" is limited to cost recovery, as TCG argues, or whether it also extends to a reasonable rent, as White Plains contends.
 
 
 39
 The statutory language is not dispositive. As ordinarily understood, "compensation" often extends to more than costs. Thus, when we discuss wages and salary as "compensation," see, e.g., I.R.C. § 61(a)(1), the term is not limited to costs. Similarly, discussing the payment of rent as "compensation" for the use of property does not strain the ordinary meanings of any of the words. And commercial rental agreements commonly use gross revenue fees as part of the price term. However, "compensation" is also sometimes used as a synonym for costs. As an example, "compensatory" damages in tort are designed to precisely offset the costs, both financial and otherwise, inflicted by the tort. Terms like compensation are flexible, taking on different meanings depending on the contexts in which they are used. Even "costs," a seemingly more concrete term that TCG argues is synonymous with "compensation" in this context, can refer either to the actual out-of-pocket expenses incurred or more broadly to the costs of capital and the "opportunity cost" of forgone alternative uses of resources. See Verizon Communications Inc. v. FCC, ___ U.S. ___, ___ n. 17, 122 S.Ct. 1646, 1666 n. 17, 152 L.Ed.2d 701 (2002). Thus, although Congress's choice of the term "compensation" may suggest that gross revenue fees are permissible, this hardly decides the issue.
 
 
 40
 The two other circuits that have addressed the question have split. The Sixth Circuit has upheld a four-percent gross revenue fee. TCG Detroit v. City of Dearborn, 206 F.3d 618, 624-25 (6th Cir.2000). The court employed a "totality of the circumstances" examination and concluded that the fee was "fair and reasonable" in light of the amount of use contemplated, the amount other providers were willing to pay, and the fact that TCG had agreed in prior negotiations to an almost identical fee. Id. at 625. The court also noted that § 253's "fair and reasonable" compensation requirement is different from the Pole Attachment Act's requirement that rates be "just and reasonable", 47 U.S.C. § 224, which is defined in terms of recovery of additional costs, and that "compensation" is different from costs. Id. at 625.
 
 
 41
 Conversely, the Ninth Circuit declared in passing that "non-cost-based fees" are "objectionable," but only after concluding that other, non-severable aspects of the local ordinances at issue required preemption. City of Auburn v. Qwest Corp., 260 F.3d 1160, 1179 & n. 19 (9th Cir.2001), cert. denied, 122 S.Ct. 809 (2002). Thus, the Ninth Circuit's statement about "non-cost-based fees" could be described as dicta.
 
 
 42
 TCG premises its argument that "fair and reasonable compensation" should be limited to costs and should exclude gross revenue fees on a collection of since-repudiated dormant Commerce Clause cases. See, e.g., Atl. & Pac. Tel. Co. v. City of Philadelphia, 190 U.S. 160, 162, 23 S.Ct. 817, 47 L.Ed. 995 (1903). TCG argues that in those cases the Supreme Court described reasonable compensation as limited to the recovery of costs, and that, despite the subsequent overruling of that line of cases, Congress should be assumed to have intended the same meaning of "reasonable." The dormant Commerce Clause cases at issue, which dealt with restrictions on the ability of states to tax interstate commerce, were overruled in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 277, 288-89, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). TCG relies on Northwest Airlines, Inc. v. County of Kent, 510 U.S. 355, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994), for the principle that Commerce Clause precedent that has been overruled nevertheless can be used to determine whether a fee is reasonable. Northwest Airlines concerned the Anti Head Tax Act, 49 U.S.C.App. § 1513, which forbids certain taxes in the operation of airports, but allows "reasonable rental charges, landing fees, and other service charges." 49 U.S.C. § 4011b(e) (formerly 49 U.S.C.App. § 1513(b)); see Northwest Airlines, 510 U.S. at 363, 114 S.Ct. 855. In construing "reasonable rental charges," the Supreme Court relied on superseded dormant Commerce Clause precedent concerning what airport fees were reasonable. Id. at 367-69, 114 S.Ct. 855. However, the circumstances of Northwest Airlines were dramatically different from the present case. Northwest Airlines interpreted the statute, which had been enacted to displace prior caselaw, see id. at 368, 114 S.Ct. 855, in light of the way that terms were used in the caselaw it displaced. In contrast, TCG asks this court to interpret the 1996 Act in light of the way terms were used in a series of unrelated cases that were overruled by the Supreme Court in 1977. Expecting Congress to be aware of how courts interpreted words in an area of law at the time that a statute was enacted to modify that law is different from assuming that Congress intended words to be interpreted in the same way they were interpreted in unrelated caselaw that had become obsolete nearly twenty years earlier.
 
 
 43
 Additionally, the policies underlying § 253(c)'s safe harbor for "fair and reasonable compensation" are significantly different from the reasons that the dormant Commerce Clause was held to restrict fees to reasonable, cost-based exactions. Section 253(c) requires compensation to be reasonable essentially to prevent monopolistic pricing by towns. Without access to local government rights-of-way, provision of telecommunications service using land lines is generally infeasible, creating the danger that local governments will exact artificially high rates. In contrast, the dormant Commerce Clause cases relied on by TCG required that rates be reasonable to ensure that they were not disguised taxes. Section 253 is not targeted at disguised taxes.
 
 
 44
 However, because the issues of whether "reasonable compensation" can include gross revenue fees and, if so, what percentage of gross revenue may be exacted are difficult and not necessary to resolve this appeal in light of the discussion which follows, we decline to reach the issue.
 
 
 45
 B. "Competitively neutral and nondiscriminatory"
 
 
 46
 White Plains does not require Verizon to comply with the terms of the Ordinance and has not required Verizon to enter into a franchise agreement comparable to the August Proposal. The City argues, and the district court agreed, that the differential treatment is "competitively neutral and nondiscriminatory," as § 253(c) requires, because of the long history of services provided to White Plains by Verizon and because Verizon provides certain in-kind compensations to the City such as free conduit space. We disagree.
 
 
 47
 Contrary to the district court's holding, the disparate treatment is plainly not "competitively neutral and nondiscriminatory." From an economics perspective, whether fees are competitively neutral should be determined based on future costs of providing services, not sunk costs incurred in the past, because that is the playing field on which the competition will take place. Cf. Verizon Communications Inc. v. FCC, ___ U.S. ___, ___-___, 122 S.Ct. 1646, 1653-54, 152 L.Ed.2d 701 (2002) (upholding FCC regulation linking "just and reasonable" rates only to forward-looking costs). Verizon's costs in providing conduits to White Plains are sunk costs; they do not affect the cost to Verizon of offering services in the future. Furthermore, Verizon was compensated for those sunk costs by receiving a monopoly on phone service within White Plains under the old system and would normally be expected to have included those costs in its rate base. If TCG is required to pay five percent of its gross revenues to the City and Verizon is not, competitive neutrality is undermined. Verizon will have the advantage of choosing to either undercut TCG's prices or to improve its profit margin relative to TCG's profit margin. Allowing White Plains to strengthen the competitive position of the incumbent service provider would run directly contrary to the pro-competitive goals of the TCA. See Preamble, 104 P.L. 104, 110 Stat. 56.
 
 
 48
 The Sixth Circuit reached a different conclusion in TCG Detroit v. City of Dearborn, 206 F.3d 618, 624-25 (6th Cir.2000). The TCG Detroit situation is not precisely analogous to the White Plains plan, however, because there the City of Dearborn attempted to require Ameritech, the incumbent service provider, to pay the same fee that it charged TCG. The attempt to charge Ameritech a franchise fee was invalidated on Michigan state law grounds. Id. at 625-26. In contrast, here White Plains has not attempted to charge Verizon the fee that it seeks to charge TCG. Thus, to the extent that TCG Detroit turned on Dearborn's attempts to treat both service providers equivalently, it is simply not applicable to this case. But because the Sixth Circuit allowed Dear-born to give the advantage to the incumbent after those attempts failed, we think TCG Detroit was wrongly decided.
 
 
 49
 The Sixth Circuit concluded that because Dearborn sought to treat TCG and Ameritech equally but was precluded from doing so by state law, it did not violate the provisions of § 253. However, § 253 does not limit municipalities to charging fees that are "competitively neutral" to the extent permitted by state law; it forbids fees that are not competitively neutral, period, without regard to the municipality's intent. Where state laws and local ordinances combine to create a fee that is not "competitively neutral," § 253 preempts the local ordinance, even if it would have been permissible absent the state law. Moreover, the Sixth Circuit's statement that TCG failed to show that Ameritech was undercutting its competitors and creating a barrier to entry misses the point that fees that exempt one competitor are inherently not "competitively neutral," regardless of how that competitor uses its resulting market advantage.
 
 
 50
 The requirements of § 253 are not inflexible, however. The statute does not require precise parity of treatment. An earlier draft of the bill that ultimately became § 253 included a provision that would have forbidden local governments from imposing any fee that "distinguishes between or among providers of telecommunications services." H.R. 1555, 104th Cong. § 243(e) (1995). Both the elimination of that provision and the language of the enacted version of § 253 strongly support the conclusion that franchise fees need not be equal. Municipalities can take into account different costs incurred by different uses of the rights-of-way. They can also consider the scale of the use of rights-of-way. They also retain the flexibility to adopt mutually beneficial agreements for in-kind compensation. Neutrally applied most-favored-vendee provisions that require service providers to offer their best rates to the city or requirements that service providers allow the city free use of conduit space or similar treatment are at least potentially permissible. A city can negotiate different agreements with different service providers; thus, a city could enter into competitively neutral agreements where one service provider would provide the city with below-market-rate telecommunications services and another service provider would have to pay a larger franchise fee, provided the effect is a rough parity between competitors.
 
 
 51
 But a municipality may not, as White Plains sought to do, impose a host of compensatory provisions on one service provider without placing any on another. The City tried to exact a variety of forms of compensation from TCG, while not exacting any compensation from Verizon on a forward-looking basis. The only compensation that Verizon has provided White Plains was the use of free conduit space, provided in the past in exchange for a complete monopoly at that time. Verizon has already reaped the benefit of those bargains. Moreover, TCG is required to provide the city with conduit space in conduits it builds. In order for the City to demand fees, most-favored-vendee status, or similar benefits from TCG, it must demand comparable benefits from Verizon, taking into account relevant differences in scale of operations and costs incurred. While municipalities may be flexible, the compensation they exact must be "competitively neutral and nondiscriminatory."
 
 
 52
 We thus hold that the five-percent gross revenue fee provisions of the August Proposal, at sections 8.1-8.4, 8.6, are not saved by § 253(c) and reverse the district court. The provisions intended to ensure payment of the fee, most notably sections 8.5 and 16 of the August Proposal, which required that financial records be available for examination and that TCG's parent guarantee payment, are rendered moot by the invalidation of the fee itself.
 
 
 53
 We affirm the district court's invalidation of the most-favored-vendee clause. See August Proposal, § 2.7. Although we take no position on whether section 2.7 should be construed as impermissible rate regulation, as the district court concluded, or as a form of compensation for use of the rights-of-way, in which case it is not competitively neutral because Verizon is not required to provide any compensation to the City, we conclude that the provision violates § 253.
 
 V. Non-fee Related Provisions
 
 54
 We next turn to the aspects of the City's plan that do not involve fees. Here, the question is whether the regulations are designed to "manage the public rights-of-way," as permitted by § 253(c), or impermissibly go further. § 253(c). We first consider the portions of the Ordinance invalidated by the district court. Two provisions that required TCG to maintain records and to allow the City to inspect its records and facilities were narrowed by the district court to apply only to the extent necessary to manage the rights-of-way. See Ordinance, §§ 2-9-01(vi) and (viii). White Plains does not appeal the limiting construction placed on these provisions.
 
 
 55
 The district court struck down a variety of provisions in the Ordinance as not directly related to the management of the rights-of-way. Thus, the district court invalidated subsections 2-3-02(ii), (vi), and (vii) of the Ordinance, which required disclosures to be made about the telecommunications services to be provided, the sources of financing for the telecommunications services, and the qualifications to receive a franchise. Similarly, the district court struck down subsections 2-7-01(ii) and 2-9-01(ii), both of which required consideration of the information required by subsections 2-3-02(ii), (vi), and (vii). Subsections 2-7-01(vi), (vii), and 2-9-01(xvii) were invalidated for allowing and requiring the White Plains Common Council to consider other factors related to the public interest in deciding whether to grant a franchise.
 
 
 56
 All of the Ordinance sections struck by the district court were properly invalidated. The disclosures mandated by the invalidated provisions were relevant only for regulating telecommunications, which § 253 does not permit White Plains to do, not for regulating use of the rights-of-way, which White Plains may do. See City of Auburn, 260 F.3d at 1177-78. Because the required information was not relevant to the permissible franchising process, subsections 2-7-01(ii) and 2-9-01(ii) likewise fall. Finally, the Ordinance's provisions allowing the White Plains Common Council to consider any factor deemed to be in the public interest provide precisely the sort of discretion to prohibit telecommunications services that § 253 preempts. See City of Auburn, 260 F.3d at 1179.
 
 
 57
 The district court's invalidation of various portions of the August Proposal was similarly correct. Sections 11.9(d) and 12.3 require prior approval of the locations of TCG's network. Although a similar requirement might be permissible if it were limited to public land, the sections as written restrict TCG's ability to develop a network even on private property and are, therefore, invalid. The district court also invalidated the record-keeping provisions of Sections 12.1 and 12.2; White Plains does not challenge this decision of the district court.
 
 
 58
 The district court also correctly invalidated sections 3.1(4) and 13.6 of the August Proposal, both of which purport to waive TCG's right to challenge illegal provisions of the franchise in court. Requiring telecommunications providers to agree not to challenge the provisions of the franchise in court is a transparent attempt to circumvent § 253. The TCA does not create a collection of default rules that municipalities and service providers can contract around. The provision would have been completely unenforceable had TCG agreed to it, but it was improper for White Plains to even propose it.
 
 
 59
 Finally, we turn to the restrictions the Ordinance and August Proposal place on transferring a franchise. See Ordinance, § 2-9-01(xii); August Proposal, § 14. The district court upheld the Ordinance's provision and by extension the August Proposal's implementation of this restriction, but we reverse. The Ninth Circuit has invalidated similar provisions, holding that they went "far beyond" regulating the use of rights-of-way. City of Auburn, 260 F.3d 1160, 1178 and n. 15. A more limited franchise transfer provision could be reasonably related to regulating the use of the rights-of-way. For example, a transfer limitation, if applied neutrally to all franchisees, might permit rejection of a transferee on the basis of insufficient assurance of ability to pay reasonably imposed fees for use of rights-of-way. However, because White Plains cannot legitimately turn away "any" provider of telecommunications services, § 253(a), a provision of sweeping breadth whose main purpose is to force each new telecommunications provider to receive White Plains's blessing before offering services, even if its services represent no change from the services offered and burdens imposed by a prior franchisee, is invalid. Because of the unfettered breadth of the provision, it cannot stand.
 
 
 60
 To summarize, we invalidate as contrary to § 253(a) and not saved by § 253(c) the following provisions of the Ordinance: Sections 2-3-02(ii), (vi), and (vii), 2-7-01(ii), (vi), (vii), and 2-9-01(ii), (xii), and (xvii) and August Proposal Sections 2.7, 3.1(4), 8, 11.9(d), 12.1, 12.2, 12.3, 13.6, and 14. August Proposal Section 16 is rendered moot by the invalidation of the five-percent gross revenue fee.
 
 CONCLUSION
 
 61
 We affirm in part and reverse in part. Costs are awarded to TCG.