Judgment rendered November 17, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,159-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

THE CITY OF SHREVEPORT            Plaintiff-Appellee

versus

CENTURYTEL SOLUTIONS,             Defendants-Appellants
LLC, ET AL.

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 591,661

Honorable Craig O. Marcotte, Judge

* * * * *

HAYES, HARKEY, SMITH &              Counsel for Appellants,
CASCIO, LLP                         CenturyTel Solutions,
By: Thomas M. Hayes, III            LLC, and CenturyLink
                                    Communications, LLC

AYRES, SHELTON, WILLIAMS,
BENSON & PAINE, LLC
By: J. Todd Benson

KUTAK ROCK LLP
By: Tiffanie D. Stasiak
     Thomas W. Snyder

CENTURYLINK LAW DEPARTMENT
By: Marcy M. Heronimus

COOK, YANCEY, KING & GALLOWAY,     Counsel for Appellee
APLC
By:  James Ashby Davis
     Sidney E. Cook, Jr.
     Elizabeth Mendell Carmody


\* \* \* \* \*


Before PITMAN, GARRETT, and STEPHENS, JJ.

**PITMAN, J**.

Defendants-Appellants CenturyTel Solutions, LLC, and CenturyLink Communications, LLC (collectively, "CenturyLink"), appeal the trial court's ruling in favor of Plaintiff-Appellee the City of Shreveport (the "City"). For the following reasons, we reverse the judgment of the trial court.

**FACTS**

On March 22, 2016, the City filed a petition for breach of contract. In August 1996, it entered into a nonexclusive franchise agreement (the "Agreement") with KMC Telecom, Inc. ("KMC"), and allowed KMC to install cable, wire, fiber or other transmission medium at any location on, over or under the public rights-of-way ("PROW") of the City for telecommunications purposes. KMC agreed to pay a franchise fee of five percent of its gross revenue (the "Fee") for each year of the term of the Agreement. For late payments, KMC agreed to pay simple interest accruing at one percent per month until the City received the payment. In 2002, CenturyLink purchased KMC's assets, including its telecommunications system in Shreveport. In its petition, the City alleged that CenturyLink failed to pay the Fee since February 27, 2002, despite having enjoyed the use and benefit of the City's PROW. It stated that CenturyLink breached the obligations it assumed under the Agreement and is liable to the City for all amounts due under the Agreement.

On July 5, 2016, CenturyLink filed an answer and a counterclaim. It admitted that the Fee had not been paid since February 27, 2002, but denied that it was in breach of any agreement with the City or that it was liable for any amounts under the Agreement. It asserted numerous affirmative defenses, including that the Agreement is unenforceable and preempted by

federal law; that CenturyLink detrimentally relied on the City's actions; that the City's substantial breach precludes its enforcement of the Agreement and CenturyLink has an excuse for nonperformance; and that the City's claims are barred by the expiration of the applicable prescriptive period.

As a counterclaim, CenturyLink requested a declaration that the Fee violates the Telecommunications Act of 1996, 47 U.S.C. § 253 ("Section 253"), and is preempted by the Supremacy Clause of Article VI of the United States Constitution. It argued that the City's attempt to enforce the Agreement is not fair or reasonable because it will drastically increase CenturyLink's costs for placing and maintaining its telecommunications facilities and other facilities in the PROW. It stated that the Fee was discriminatory because it had not been imposed on CenturyLink's competitors. It found fault with the City's failure to adopt a master telecommunications ordinance ("MTO") and charge all telecommunications providers a fee. It also requested an injunction prohibiting the City from enforcing the Agreement.

On September 6, 2016, the City filed an answer to the counterclaim and denied CenturyLink's allegations. It objected to CenturyLink's use of federal law when state law provides an adequate procedural remedy.

On July 2, 2018, the City filed a motion for partial summary judgment. It requested that the trial court find that the Agreement is valid and enforceable and that CenturyLink is liable for all outstanding amounts due under the Agreement.

CenturyLink filed an opposition to the City's motion for partial summary judgment. It contended that there is overwhelming evidence that the Fee is discriminatory and inconsistent with Section 253.

2

On September 16, 2019, a hearing was held, and the trial court denied the motion for partial summary judgment.

A two-day bench trial began on November 12, 2019. The parties stipulated that interest would be calculated by dividing CenturyLink's annual revenues by 12 to obtain monthly amounts of revenue. Several witnesses were tendered by the City.

Charles A. Albert, CPA, was accepted as an expert in the audit of telecommunications companies. He stated that from March 2006 to 2018, the total revenue from nonexempt customers was $80,734,316, which would amount to a Fee of $4,036,715 that CenturyLink owed the City. He also determined that CenturyLink owed $2,740,752 for the late-payment assessment, which he calculated at one percent. In total, he calculated that CenturyLink owed the City $6,777,467 through December 31, 2018. He noted that this did not include any revenues from 2019.

Garth Ashpaugh, CPA, was accepted as an expert in the evaluation and cost analysis of the PROW within municipalities. He stated that, as evidenced by documents from the assignment of the Agreement in 2002, CenturyLink realized and accepted its obligations under the Agreement, including the payment of the Fee. He was not aware of any evidence that CenturyLink sought to modify the Agreement. He testified that CenturyLink was not the only user of the PROW, but that it did use them in furtherance of its business, which impacted the costs incurred by the City for public works maintenance. He stated that it is a standard of business for CenturyLink to pay franchise fees to municipalities across the country and that it often provides in-kind services as part of its franchise agreements. He opined that

3

CenturyLink's payment of the Fee would not have impeded it from entering or competing in the Shreveport market.

James A. Richardson, Ph.D., was accepted as an expert in economics. He stated that franchise fees are commonly used around the country and that a franchise fee of five percent in other parts of the country has not deterred business or inhibited expansion of telecommunications services in those areas. He concluded that the Fee was not an important factor to CenturyLink in offering services in Shreveport and would not be a barrier to entering the Shreveport market. On cross-examination, he was asked about the discriminatory nature of the Fee in comparison to the City's agreement with AT&T. He differentiated AT&T's residential market from CenturyLink's business market.

Charles J. Madden, the director of finance for the City, located checks from KMC beginning in 1996 that were for a "franapp" fee, which is similar to a franchise fee.

The City rested, and CenturyLink presented its witnesses.

Steven C. Gordon, the senior director of dark fiber and right-of-way for CenturyLink, explained CenturyLink's corporate structure and history. He stated that CenturyLink is a competitive local exchange carrier rather than an incumbent local exchange carrier and that it provides voice and internet services and advanced telecommunication services to business customers in Shreveport. He noted that CenturyLink does not provide service to residential customers. He stated that CenturyLink is a wireline carrier, meaning it provides copper and fiber network connectivity to customers rather than wireless services and that it requires access to the PROW to provide the wireline service. He explained that there are three

fiber rings that run through Shreveport with a route mileage of 35.5 miles in PROW—25.53 aerial miles on power poles and 9.93 miles underground. He stated that AT&T is the incumbent local exchange carrier in Shreveport and that CenturyLink and AT&T compete for business customers. He testified that not all markets in which CenturyLink operates require a franchise agreement and that not all franchise fees are a percentage of revenues. He stated that in some markets, CenturyLink passes the fee on to its customers. He calculated that the Fee for the years 2006 to 2016 would average $311,000 per year and stated that AT&T contracted to pay the City $25,000 per year. He stated that AT&T is a heavier user of the PROW in Shreveport as evidenced by the ubiquitous nature of its network. He noted that if CenturyLink were operating under the City's facility permit fee, which is calculated as $0.09 per foot, it would only pay $17,000 per year. Through an effective rate comparison, he determined that CenturyLink paid $1.66 per foot and AT&T paid $0.002 per foot. He concluded that this difference is a detriment to CenturyLink's ability to offer the best or equal prices to customers for its services. He testified that CenturyLink wants to continue to do business with the City using the facility permit fee rather than the franchise fee. On cross-examination, he testified that he had no knowledge of CenturyLink attempting to negotiate with the City for a lower fee.

Kiran Seshagiri testified that he was previously employed by CenturyLink in the tax department, and most recently as the senior director of tax systems and billing. He was involved in the application process for CenturyLink to be assigned KMC's Agreement with the City, at which time he became aware of the Fee. Through conversations with AT&T, he learned that AT&T was not paying a franchise fee to the City. This was significant

5

to CenturyLink, and in its application, it protested that the Fee was not being equally applied. He recalled that the City intended to cure this discrimination through the adoption of an MTO, which would impose a five-percent fee on all carriers, including AT&T.

Gary Carver, the senior manager of engineering construction for CenturyLink, testified about the fiber network in Shreveport. He stated that KMC provided the City with free use of eight strands of fiber in 1996, which it uses for its internal network. He valued the average monthly cost per strand to be $2,931.25, which totals $6,120,450 for 1996 to 2017. Regarding the City's costs for managing the PROW, he stated that CenturyLink's access of cables on power poles and of underground cables through manholes does cost the City. He noted that a directional boring machine is used to install cables beneath streets without disturbing or damaging the City's streets and facilities. He testified that from 2007 to 2016, CenturyLink made $12 million of capital investments in the infrastructure in Shreveport. On cross-examination, he admitted that these capital costs included projects in Bossier Parish.

Mark Santos, the City's Deputy Director of Information Technology, testified that CenturyLink provides the City with eight strands of fiber and that the City is allowed to use the strands as it sees fit. He detailed which of the City's buildings are connected to the fibers. He noted that, based on an estimate from Uniti, the City saves $150,000 per year by using CenturyLink's fibers. On cross-examination, he testified that the City pays CenturyLink an average of $250,000 per year for internet and telephone services.

Keith Hightower testified that he served on the Shreveport City Council from 1990 to 1998 and as the Shreveport mayor from 1998 to 2005. While on the City Council, he sponsored a resolution that authorized the mayor to execute interim franchise agreements for telecommunications services and encouraged the development of a complete regulatory scheme for operation of the telecommunication industry within the City, i.e., an MTO. He noted that the primary impetus of this resolution was the Telecommunications Act of 1996. He stated that the intent of an MTO was for all providers to pay a franchise fee. He noted that a paragraph in the Agreement indicated that KMC wanted to be treated equally with all other providers and pay the same franchise fee and that the Agreement referred to a future MTO. As mayor, he signed the letter approving the assignment of the Agreement to CenturyLink. He stated that CenturyLink did not request to eliminate the obligation to pay the Fee and that it was his expectation that CenturyLink would pay the Fee. He testified that during his time as mayor, he was not aware that CenturyLink failed to pay the Fee.

William Fitzsimmons, Ph.D., was accepted as an expert in the field of economic issues in the telecommunications industry. He detailed the telecommunications industry leading up to the Telecommunications Act of 1996. He noted that competition in the industry had increased dramatically since 1996. He testified that there is a reasonable and economically sound basis for a carrier to provide an in-kind contribution to a city for occupying the PROW. He noted that CenturyLink's eight fibers are a valuable asset provided to the City. He testified that at five percent of the company's revenue, the Fee is material and that it materially inhibits or limits CenturyLink's ability to compete in a fair and balanced legal and regulatory

7

environment. He stated that all entities that cause a city to incur costs should be willing to compensate the city for those costs. He reasoned that the Fee is not based on any cost that CenturyLink causes the City, which is patently unfair. He also reasoned that the Fee is discriminatory, as evidenced in that CenturyLink faces $310,000 per year while its competitor AT&T faces $25,000 per year. He noted a new ordinance that allows entrants into the market to pay $0.09 per foot per year, which would cost CenturyLink $17,000 if it could avail itself of that new ordinance. He concluded that the Fee is not fair, reasonable or balanced.

Patrick Furlong, the City's Director of the Department of Engineering and Environmental Sciences, testified that utilities obtain permission to occupy the PROW through a franchise agreement or a facility permit. He stated that in 2018, the Shreveport City Council adopted an ordinance that created a new category of facility permit fees for non-pipeline carriers, including telecommunications facilities. It allowed telecommunications companies to apply for facility permit fees at $0.09 per foot when entering the market with the option of a franchise agreement in the future. He stated that all of the City's policies intend to be nondiscriminatory.

Eric A. Osburne testified that when he served as CenturyLink's general manager of the southern region, he was the face of the company to the local community and was the point man with Shreveport officials. He thought CenturyLink did not pay the Fee to the City because the fiber strands were given in lieu of payment. He stated that Shreveport officials never brought up the nonpayment of the Fee or demanded payment.

On January 31, 2020, the trial court filed its findings of fact and reasons for judgment. It stated the following findings of fact: that the City

and CenturyLink entered into the Agreement in 2002; that the Agreement specified that CenturyLink was to pay a five-percent fee to the City based on gross revenue; that AT&T paid $25,000 per year to the City as a franchise fee; that CenturyLink had not paid the Fee since 2002; that the City did not attempt to collect the Fee until 2016; that the City has not put in place an MTO; that CenturyLink provides fiber optic cable access to the City free of charge; and that CenturyLink has not paid any sales taxes to the City. The trial court concluded that the Agreement is not preempted by Section 253 and that it does not prohibit or effectively prohibit telecommunications services being provided by CenturyLink. It noted that CenturyLink did not object to signing the Agreement, that no negotiations took place regarding the amount of the Fee and that CenturyLink's practice was to pass franchise fees on to its customers. It determined that CenturyLink's defenses do not warrant any reduction, offset or credit. It found that CenturyLink agreed to provide telecommunications services to the City at no charge pursuant to the Agreement and that CenturyLink did not present any evidence that the services were in lieu of payment of the Fee. It noted that due to prescription, the Fee would be calculated from March 22, 2006, to the present and found that CenturyLink owed $6,777,467 to the City. It also noted that it did not have information at the time of trial to rule on the amounts claimed after 2018 and stated that the parties would agree on this amount in the future. It determined that the City was entitled to and awarded interest for late payment of fees. It rejected the claim for sales tax because the City did not comply with procedures to put CenturyLink on notice.

On March 9, 2020, the trial court filed a partial final judgment in favor of the City and against CenturyLink. It stated that CenturyLink owed

9

the City $7,251,842, together with contractual interest of 6.55 percent from January 1, 2020, until paid in full. It stated that the City is also entitled to judgment for amounts determined by CenturyLink's 2019 gross revenue in an amount to be awarded in a subsequent judgment.

On July 2, 2020, the trial court filed a final judgment in favor of the City and against CenturyLink. It stated that CenturyLink owed the City $7,441,226, together with contractual interest of 6.55 percent from January 1, 2020, until paid in full.

CenturyLink appeals.

## DISCUSSION

In its first assignment of error, CenturyLink argues that the trial court erred in its analysis of Section 253 by entering judgment for the City on its breach of contract claim. It states that the standard of review is *de novo* rather than manifest error. It contends that it established that the Fee was discriminatory and preempted by Section 253 as a matter of law. It compares the Agreement to AT&T's franchise agreement with the City to illustrate the discriminatory nature and impact of the Fee.

The City argues that the judgment of the trial court is not manifestly erroneous. It contends that CenturyLink failed to meet its burden of proof on its affirmative defense of federal preemption under Section 253. It states that CenturyLink's focus on AT&T's payment of $25,000 per year does not consider that this is a portion of its annual obligations to the City. It calculates that from 2002 to 2015, AT&T paid the City over $9.7 million for a two percent charge on local telephone service rendered within Shreveport, which applies to both residential and business markets.

10

The issue of preemption derives from Article VI of the U.S. Constitution which provides that "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land." Therefore, any state law that conflicts with federal law has no effect. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992); *Levine v. First Nat. Bank of Com.*, 06-0394 (La. 12/15/06), 948 So. 2d 1051. However, consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, *supra*, *quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947).

Through the Telecommunications Act of 1996, Congress sought to eliminate monopolies and boost competition in local markets. *Verizon Commc'ns, Inc. v. F.C.C.*, 535 U.S. 467, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002). States may no longer enforce laws that impede competition. *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed. 2d 835 (1999).

Section 253(a) states:

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

Section 253(c) adds:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory

> basis, if the compensation required is publicly disclosed by such government.

Section 253(d) provides:

> If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

Although not binding on this court, federal courts provide guidance on the provisions of Section 253. *See Shell Oil Co. v. Sec'y, Revenue & Tax'n*, 96-0929 (La. 11/25/96), 683 So. 2d 1204 ("In matters involving federal law, state courts are bound only by decisions of the United States Supreme Court. Federal appellate court decisions are persuasive only."). The Third Circuit stated that "Section 253 is quite inartfully drafted and has created a fair amount of confusion." *New Jersey Payphone Ass'n, Inc. v. Town of W. New York*, 299 F. 3d 235 (3d Cir. 2002). Federal courts differ on whether a violation of subsection (a) is a prerequisite to the analysis of subsection (c). *See Id.*; *Level 3 Commc'ns, L.L.C. v. City of St. Louis, Mo.*, 477 F. 3d 528 (8th Cir. 2007). Federal courts disagree on whether gross revenue fees are permissible compensation. *See TCG New York, Inc. v. City of White Plains*, 305 F. 3d 67 (2d Cir. 2002); *TCG Detroit v. City of Dearborn*, 206 F. 3d 618 (6th Cir. 2000).

In *TCG New York, Inc. v. City of White Plains*, *supra*, the Second Circuit considered the city's attempt to impose a five-percent franchise fee on one provider, but not another. It stated:

> If TCG is required to pay five percent of its gross revenues to the City and Verizon is not, competitive neutrality is undermined. Verizon will have the advantage of choosing to either undercut TCG's prices or to improve its profit margin

relative to TCG's profit margin. Allowing [the City] to strengthen the competitive position of the incumbent service provider would run directly contrary to the pro-competitive goals of the [the Telecommunications Act].

It explained:

> [Section 253] does not require precise parity of treatment. Municipalities can take into account different costs incurred by different uses of the rights-of-way. They can also consider the scale of the use of rights-of-way. They also retain the flexibility to adopt mutually beneficial agreements for in-kind compensation. . . . A city can negotiate different agreements with different service providers; thus, a city could enter into competitively neutral agreements where one service provider would provide the city with below-market-rate telecommunications services and another service provider would have to pay a larger franchise fee, provided the effect is a rough parity between competitors.

> But a municipality may not . . . impose a host of compensatory provisions on one service provider without placing any on another. . . .

> . . . While municipalities may be flexible, the compensation they exact must be "competitively neutral and nondiscriminatory."

Accordingly, the Second Circuit determined that the five-percent gross-revenue fee was not saved by Section 253(c). *Id.*

The case *sub judice* contains no dispute of the material facts and, instead, involves the determination of a legal issue. In this situation, reviewing courts are not to apply the manifest error standard of review, but, rather, are to apply the *de novo* legal standard of review. *Kevin Assocs., L.L.C. v. Crawford*, 03-0211 (La. 1/30/04), 865 So. 2d 34, *citing Kem Search, Inc. v. Sheffield*, 434 So. 2d 1067 (La. 1983). Appellate review of a question of law, which is *de novo,* is simply to determine whether the trial court was legally correct or legally incorrect. *Johnson v. Breck Co. ¥Co.*, 32,311 (La. App. 2 Cir. 9/22/99), 743 So. 2d 296. Questions of law, such as the proper interpretation of a statute, are reviewed by this court under the *de*

*novo* standard of review. *City of Shreveport v. Shreveport Mun. Fire & Police Civ. Serv. Bd.*, 52,410 (La. App. 2 Cir. 1/16/19), 264 So. 3d 643.

In our *de novo* review, we find that the trial court was legally incorrect in its application of Section 253 to the case *sub judice*.

As noted by the U.S. Supreme Court in *Verizon Commc'ns, Inc. v. F.C.C.*, *supra*, and *AT&T Corp. v. Iowa Utilities Bd.*, *supra*, Congress's purpose in enacting the Telecommunications Act of 1996 was to boost competition and eliminate laws that impede competition. Section 253 authorizes preemption of state and local laws and regulations expressly or effectively prohibiting the ability of any entity to provide telecommunications services. *Nixon v. Missouri Mun. League*, 541 U.S. 125, 124 S. Ct. 1555, 158 L. Ed. 2d 291 (2004). The Fee has the effect of prohibiting CenturyLink's ability to provide telecommunications services to the City. To pay the Fee, CenturyLink would have to pass it on to its customers, which would raise its prices and prevent it from offering the best prices, or prices equal to those charged by its competition, to customers for its services. Therefore, we find that the imposition of the Fee is preempted by Section 253(a).

The Fee violates Section 253(c) because it is not applied on a competitively neutral and nondiscriminatory basis. The City required CenturyLink to pay a five-percent gross-revenue fee and provide fibers for the City's use, neither of which was required of AT&T. The disparity in fees charged AT&T and CenturyLink is undeniable and cannot be considered competitively neutral. The City's failure to impose such a fee on other providers clearly constitutes a discriminatory practice and violates Section 253(c).

14

CenturyLink entered the assignment of the Agreement with the understanding that the City would correct the discrepancies in compensation among providers with the adoption of an MTO. The Agreement stated that the City was "developing [an MTO] to govern the use of its [PROW] as authorized by the recently enacted federal Telecommunications Act of 1996." It further noted that the parties understood that the Agreement was "subject to the provisions of a future [MTO]." Attached to the Agreement was CenturyLink's application in which it emphasized its request that the City "require equivalent compensation from all current and future Applicants of a Franchise for Telecommunications Services providing the same or similar telecommunications services." The City has not adopted or enforced an MTO, which constitutes a breach of contract on the part of the City and perpetuates the discriminatory nature of the Fee.

Accordingly, this assignment of error has merit. This finding pretermits discussion of CenturyLink's remaining assignment of error regarding affirmative defenses.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court and enter judgment in favor of Defendants-Appellants CenturyTel Solutions, LLC, and CenturyLink Communications, LLC, and against Plaintiff-Appellee the City of Shreveport. Costs of appeal in the amount of $4,732.38 are assessed to the City of Shreveport.

**REVERSED.**

15